Pages 1 - 77

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

IN RE: SOCIAL MEDIA ADOLESCENT )
ADDICTION/PERSONAL INJURY )
PRODUCTS LIABILITY LITIGATION. )
)
) **NO. C 22-MD-03047-YGR**
)
_____)

San Francisco, California
Friday, January 26, 2024

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiffs:

        SEEGER WEISS, LLP
        55 Challenger Road, 6th Floor
        Ridgefield Park, NJ 07660
    BY: **CHRISTOPHER SEEGER, ESQ.**
        **JENNIFER R. SCULLION, ESQ.**
        **CHRISTOPHER L. AYERS, ESQ.**

        SEEGER WEISS, LLP
        100 Church Street
        New York, NY 10007
    BY: **ERICA KUBLY, ESQ.**

        Lieff, Cabraser, Heimann and Bernstein
        275 Battery Street, 29th Floor
        San Francisco, CA 94111
    BY: **LEXI J. HAZAM, ESQ.**
        **PATRICK I. ANDREWS, ESQ.**

REPORTED REMOTELY BY:  Stephen W. Franklin, RMR, CRR, CPE
                    Official United States Reporter

```
APPEARANCES (Cont.'d):
```

For Plaintiffs:

```
                LIEFF, CABRASER, HEIMANN AND BERNSTEIN
                250 Hudson Street, 8th Floor
                New York, NY 10013
          BY:   JASON L. LICHTMAN, ESQ.
                GABRIEL A. PANEK, ESQ.


                MOTLEY RICE, LLC
                401 9th Street Northwest, Suite 630
                Washington, DC 20004
          BY:   PREVIN WARREN, ESQ.


                MOTLEY RICE, LLC
                28 Bridgeside Boulevard
                Mt. Pleasant, SC 29464
          BY:   ANNIE KOUBA, ESQ.


                ANDRUS ANDERSON, LLP
                155 Montgomery Street, Suite 900
                San Francisco, CA 94104
          BY:   JENNIE L. ANDERSON, ESQ.


                SOCIAL MEDIA VICTIMS LAW CENTER, PLLC
                520 Pike Street, Suite 1125
                Seattle, WA 98101
          BY:   MATTHEW P. BERGMAN, ESQ.


                BERGMAN DRAPER LADENBURG
                614 1st Avenue, 4th Floor
                Seattle, WA 98104
          BY:   GLENN S. DRAPER, ESQ.


                WEITZ AND LUXENBERG, P.C.
                700 Broadway
                New York, NY 10003
          BY:   JAMES J. BILSBORROW, ESQ.


                C.A. GOLDBERG, PLLC
                16 Court Street, 33rd Floor
                Brooklyn, NY 11241
          BY:   CARRIE GOLDBERG, ESQ.


                WALSH LAW, PLLC
                14 Ridge Square Northwest, Third Floor
                Washington, DC 20016
          BY:   ALEXANDRA M. WALSH, ESQ.
```

```
APPEARANCES (Cont.'d):

For Plaintiffs:    SIMMONS HANLY CONROY, LLC
                   One Court Street
                   Alton, IL 62002
              BY:  JAYNE CONROY, ESQ.

                   KESSLER, TOPAZ, MELTZER, AND CHECK, LLP
                   280 King of Prussia Road
                   Radnor, PA 19087
              BY:  MELISSA L. YEATES, ESQ.

                   LEVIN, SEDRAN AND BERMAN, LLP
                   510 Walnut Street, Suite 500
                   Philadelphia, PA 19106
              BY:  MICHAEL M. WEINKOWITZ, ESQ.

                   BRUSTER, PLLC
                   680 North Carroll Avenue, Suite 110
                   Southlake, TX 76092
              BY:  EDWARD K. CHIN, ESQ.

                   COLORADO DEPARTMENT OF LAW
                   1300 Broadway, 6th Floor
                   Denver, CO 80203
              BY:  BIANCA MIYATA, ESQ.
                   ELIZABETH A. OREM, ESQ.

                   MEGAN O'NEILL
                   455 Golden Gate Avenue, 11th Floor
                   San Francisco, CA 94102
              BY:  MEGAN O'NEILL, ESQ.

                   CALIFORNIA DEPARTMENT OF JUSTICE
                   1515 Clay Street, Suite 2000
                   Oakland, CA 94612
              BY:  JOSHUA E. OLSZEWSKI-JUBELIRER, ESQ.

                   CALIFORNIA DEPARTMENT OF JUSTICE
                   CONSUMER PROTECTION SECTION
                   300 South Spring Street
                   Los Angeles, CA 90013
              BY:  MARISSA ROY, ESQ.

                   KENTUCKY OFFICE OF THE ATTORNEY GENERAL
                   OFFICE OF CONSUMER PROTECTION
                   1024 Capital Center Drive, Suite 200
                   Frankfort, KY 40601
              BY:  JOHN C. LEWIS, ESQ and DANIEL KEISER, ESQ.
```

**APPEARANCES (Cont.'d):**

For Plaintiffs:

        NEW JERSEY OFFICE OF THE ATTORNEY GENERAL
        DIVISION OF LAW
        124 Halsey Street, P.O. Box 45029
        Newark, NJ 07102
  BY: **THOMAS HUYNH, ESQ.**

        GIBBS LAW GROUP, LLP
        1111 Broadway, Suite 2100
        Oakland, CA 94607
  BY: **ANDRE M. MURA, ESQ.**

For Defendants:

        COVINGTON AND BURLING, LLP
        One City Center, 850 Tenth Street, Northwest
        Washington, DC 20001
  BY: **PAUL W. SCHMIDT, ESQ.**

        COVINGTON AND BURLING, LLP
        1999 Avenue of the Stars, Suite 3500
        Los Angeles, CA 90067
  BY: **ASHLEY M. SIMONSEN, ESQ.**

        MUNGER, TOLLES AND OLSON, LLP
        560 Mission Street, 27th Floor
        San Francisco, CA 94105
  BY: **JONATHAN H. BLAVIN, ESQ.**

        KING & SPALDING, LLP
        1180 Peachtree Street, Northeast, Suite 1600
        Atlanta, GA 30309
  BY: **GEOFFREY DRAKE, ESQ.**
       **TaCARA D. HARRIS, ESQ.**

        FAEGRE, DRINKER, BIDDLE & REATH, LLP
        300 North Meridian Street, Suite 2500
        Indianapolis, IN 46204
  BY: **ANDREA PIERSON, ESQ.**

        **Faegre, Drinker, Biddle & Reath, LLP**
        90 South 7th Street, Suite 2200
        Minneapolis, MN 55402
  BY: **AMY R. FITERMAN, ESQ.**

**APPEARANCES (Cont.'d):**

For Defendants:

                WILSON, SONSINI, GOODRICH & ROSATI
                1301 Avenue of the America, 40th Floor
                New York, NY 10019
        BY:  **BRIAN M. WILLEN, ESQ.**

                WILSON, SONSINI, GOODRICH & ROSATI
                953 East Third Street, Suite 100
                Los Angeles, CA 90013
        BY:  **MATTHEW DONOHUE, ESQ.**

| | |
|---|---|
1  | <u>**Friday - January 26, 2024**</u>                                    <u>**9:29 a.m.**</u>

2  |                          <u>P R O C E E D I N G S</u>

3  |                               ---o0o---

4  |          **THE COURTROOM DEPUTY:**  Your Honor, now calling the

5  | civil matter 22-MD-03047-YGR, In Re: Social Media Adolescent

6  | Addiction/Personal Injury Products Liability Litigation.

7  |      May I have the first speaker step forward and --

8  |          **THE COURT:**  Hold on.  They don't know who the first

9  | speaker is going to be.

10 |          **THE COURTROOM DEPUTY:**  Sorry, Your Honor.

11 |          **THE COURT:**  All right.  So as is our practice, you've

12 | signed in on the attorneys sheet, and that will be the record

13 | of who's here today.  It looks like you all were able to make

14 | it into the courthouse.  Apologies if there was any delay in

15 | getting you through, but that's democracy at work.  There is

16 | another proceeding here in this courthouse that has attracted

17 | much attention.  Not surprisingly, this one as much as that

18 | one.  In any event, we have a lot to do today.

19 |      Because, once again, the courts are going through

20 | shortages of court reporters, I do have a court reporter doing

21 | these proceedings remotely.  I'm going to ask Mr. Cuenco to

22 | send me an invite so I can join and not boot him off, like I

23 | did accidentally yesterday.

24 |      So we have a number of things to do today.  One is I'll

25 | take any update with respect to what happened yesterday with

Judge Kang.  We have the interlocutory appeal issue.  We have a number of issues with respect to motion practice generally.  You all asked in your case management order about bellwether protocols.  There's some implementation orders that I need to review with you.  And then after we're done, I've got a number of plaintiffs' attorneys who I will meet with individually and on an ex parte basis.  So that's the general overview.  If there are other things that we need to do, make a running list and we can deal with them later.

I did -- where is Ms. Anderson?  Ms. Anderson, I'm going to give you some time to do this, and so this is why I'm mentioning it now.  In preparation for my meetings with plaintiffs' attorneys, I want to make sure that I understand what the leadership communicated.  So not my order, what the leadership communicated to the plaintiffs' lawyers about the structure of the -- of the group and the assignments that were being given.  That is the document I'm looking for, not my own orders.  I have my own orders.

Come to the mic, please, if you have something to say, and make sure to identify yourself.

MS. ANDERSON:  Good morning, Your Honor.  Jennie Lee Anderson on behalf of plaintiffs.  I did communicate with chambers again this morning, and we did send you the communication from co-lead counsel that we believe you are looking for.

 1          **THE COURT:**  Because the things you sent they told me

 2     were not what I -- when they communicated them to me, they were

 3     not what I was looking for.  So which is --

 4          **MS. ANDERSON:**  So I asked if it was -- I asked

 5     chambers if it was an order or a communication from Your Honor,

 6     and we understood that it wasn't, that it was a communication

 7     from co-lead counsel to other plaintiffs, and we have forwarded

 8     you that e-mail with respect -- that we think you're looking

 9     for.  I don't know if you've seen the e-mail from co-leads.

10          **THE COURT:**  Okay.  Well, they will send it to me, and

11     if not, then I will interrupt and give you some time when I

12     finish talking.

13          **MS. ANDERSON:**  Yes, Your Honor.

14          **THE COURT:**  Okay.  First, we will go ahead and start

15     with the argument on interlocutory appeal.  So who will be

16     doing that?

17          **MR. LICHTMAN:**  Good morning, Your Honor.  On behalf

18     of the plaintiffs, Jason Lichtman, Lieff Cabraser.

19          **THE COURT:**  And?

20          **MS. MIYATA:**  And good morning, Your Honor.  Bianca

21     Miata on behalf of the state plaintiffs.

22          **MR. WILLEN:**  Good morning, Your Honor.  Brian Willen

23     on behalf of the Google defendants, but speaking for the

24     defense group here.

25          **THE COURT:**  Okay.  I am not inclined to grant your

1   motion.  You can proceed.

2           **MR. WILLEN:**  Okay.  So --

3           **THE COURT:**  Well, that's why I'm starting with you.

4           **MR. WILLEN:**  No, I appreciate that.

5       So, I mean, we think the order meets all the statutory

6   criteria under 1292(b), and I'm happy to just walk through, and

7   if the Court has questions or things that I can help clarify,

8   I'm more than happy to do that.

9       So the first point is that we have identified several

10  different what we consider to be controlling issues of law,

11  legal questions that the Court resolved that are vital to the

12  continued proceedings here.

13      So the first has to do with the failure to warn issue.  So

14  the question that was decided was whether a failure to warn,

15  whether framing a claim as a failure to warn claim removes it

16  from the protections of Section 230, where the failure to warn

17  is premised on a cause of action that would otherwise be

18  barred.  That, we think, is a straightforward legal question.

19      The second is whether the First Amendment applies to and

20  prohibits claims seeking to impose legal obligations that would

21  require more robust age verification protocols or more robust

22  parental controls.  Again, we think that's a pretty clean legal

23  question.

24      And then the third is whether the defendants' platforms or

25  certain features within those platforms are products for

1  purposes of products liability law.

2      So all of these are legal questions, I think they were

3  resolved by the Court as legal questions, and they're

4  controlling in the sense that they will -- obviously there's an

5  overlap between the first factor and the third factor, but all

6  of these questions are vital to the priority claims that the

7  plaintiffs put forward, the claims that the plaintiffs said are

8  the ones that were the most important, the gravamen of their

9  case, and resolving those questions would, in our view, clearly

10  materially advance the ultimate termination of the litigation.

11      With respect to the second issue, which is substantial

12  grounds for disagreement, I think on each of those we've

13  explained that not only could reasonable jurists disagree with

14  the way that the Court has resolved those issues, but, in fact,

15  there has been disagreement on each of those, on each of those

16  issues.  So on failure to warn we cited a number of cases, but

17  I think most prominently the decisions from the Texas Supreme

18  Court in the *Facebook* case and the Second Circuit in the

19  *Herrick versus Grindr* case, but there are many others that

20  basically say if you have a claim that would be -- be barred by

21  Section 230 if asserted as a negligence claim or a product

22  liability claim, then describing that as a failure to warn

23  about the dangers of features, the dangers of certain

24  publication features, doesn't take you outside of Section 230.

25  So we think there's pretty clear disagreement on that issue.

1    With respect to the First Amendment issue and parental

2    controls, we cited a number of cases, including at least three

3    recent decisions, one from Judge Friedman in the *Bonta* case,

4    another case from Arkansas, the *Griffin* case, and then a more

5    recent TRO decision from Ohio, the *Yost* case, all of which have

6    enjoined statutes that have attempted to put requirements to do

7    certain kinds of parental consent or age verification on some

8    of the very services at issue here, and those courts have found

9    that those laws violate the First Amendment.  So again, it's

10    clearly a difference of opinion about the First Amendment's

11    applicability.

12    And then the third issue obviously is the product

13    liability issue, and here we have disagreement or conflict to

14    some degree between this court and the JCCP court on the

15    question of whether the defendants' platforms or certain

16    features within them are products that are subject to products

17    liability claims.  So, of course, Judge Kuhl found that they

18    were not.  This Court has found that there's a complicated

19    defect-by-defect analysis that has to be applied, and under

20    that analysis at least some of the features at issue are

21    products and can be subject to products liability claims.  So

22    again, I think there's a pretty clear and substantial

23    disagreement on that issue.

24    And then in terms of the -- whether these issues would

25    materially advance the ultimate termination of the lawsuit, I

 1    think, again, it seems pretty clear to us that they would.

 2    Just to take the products liability issue, if the Ninth Circuit

 3    were to adopt the view that either Judge Kuhl had or that a

 4    number of other courts have taken on this question, those

 5    products liability claims, the claims that the plaintiffs put

 6    forward as their priority claims, the claims that they thought

 7    were the strongest, would be out of the case, and those are the

 8    only claims, of course, that have been allowed to proceed.

 9        So if that wouldn't materially advance the ultimate

10    termination of the lawsuit, it's hard to think of what would.

11    But even a more narrow or more nuanced ruling would

12    substantially affect the way that discovery happens, the way

13    that the parties shape the lawsuit, summary judgment and

14    ultimately what trial looks like.  And it's not required under

15    1292(b) that the resolution of the certified question

16    immediately terminate the lawsuit, although we think at least

17    with the products issue there's a chance that it would.

18        So this seems to us a fairly straightforward case where

19    each of the three statutory criteria are met.  Obviously the

20    Court has discretion to make a decision about what it wants to

21    do, but we think this is a case where granting a 1292(b)

22    interlocutory appeal would substantially help the parties and

23    the Court get to a more orderly, more efficient and more

24    expeditious resolution of the case.

25        So that's our pitch.  If there's particular things that

1    the Court would like me to address, I'm more than happy to do

2    it.

3            **THE COURT:**  You can proceed.

4            **MR. LICHTMAN:**  May it please the Court.  Your Honor,

5    again, this is Jason Lichtman for the individual plaintiffs.

6            There really was not anything that was much different than

7    what defendants put in their briefs there, and so by and large,

8    we'll rest on the papers unless Your Honor has some questions.

9            But there is just one point that I'd like to make, though,

10   that I heard for the first time, which is that defendants made

11   the point that really the way they're conceiving of this, their

12   argument about Prong 1 about whether there's a controlling

13   question of law, and their argument about whether it would

14   advance the resolution of the case really overlap, and the

15   Ninth Circuit has said that that's absolutely not the way that

16   courts should analyze whether 1292 is appropriate.  And that's

17   from the *Cement* case back in 1982.

18           And it's important to note that what defendants have not

19   really done is identify a single or multiple controlling

20   questions of law where there was substantial disagreement about

21   those controlling questions of law, and resolution of that

22   disagreement would advance the ultimate termination of the

23   litigation.

24           Instead what they've done, particularly in briefing -- and

25   again, it's something of what I heard up here today -- is that

1    they've identified some disputes about the law, they've

2    identified some areas where they think that there are other

3    courts that have done other things, and they've made some

4    arguments about efficiency.  But they haven't actually tied

5    together this is the controlling question, here is the dispute

6    about this legal issue, and here's how resolving that dispute

7    advances the litigation.

8        And to that end it's notable that on reply, one of the

9    cases that they relied on as similar to this one is the *MCI*

10    case.  And, in fact, when that appears in their brief, it is

11   their only citation on reply.  And that's a case in which the

12   Central District of California did exactly what defendants are

13   asking this Court to do.  It certified a question that the

14   defendants in that case argued was a little different, a little

15   interesting, but where they didn't identify an actual dispute

16   over the controlling question of law that would advance the

17   case.

18       And it's interesting defendants cited that *MCI* case,

19   because the Ninth Circuit denied that petition for review.  In

20   that case that defendants cite as the -- and again, it's the

21   only case in that section of their brief -- in that case the

22   defendant cited similar to this one.

23       Again, happy to answer any questions from the Court.

24   Otherwise, we submit on the papers.

25           **MS. MIYATA:**  Your Honor, I'll keep my comments quite

1   brief.  Bianca Miata on behalf of the state plaintiffs.

2       As the Court is well aware, the parties are currently

3   engaged in briefing a wave of motions to dismiss filed by Meta,

4   and in Meta's pending motions, Meta has raised challenges under

5   Section 230, the First Amendment, same or similar issues of law

6   that they seek to have this Court certify for interlocutory

7   appeal.  To do what Meta has asked is going to do the opposite

8   of materially advancing the ultimate termination of this

9   litigation as required under 1292(b), and I'll just skip

10  straight to that third prong.  It raises --

11          THE COURT:  Ms. Miyata, if you could turn that mic so

12  we can hear you better, please.

13          MS. MIYATA:  Oh, apologies.

14          THE COURT:  No worries.

15          MS. MIYATA:  Is that a little bit better?

16          THE COURT:  A little bit.

17          MS. MIYATA:  I'll do better to speak directly into

18  the mic.  Thank you.

19      To grant Meta's request would do the opposite of

20  materially advancing the ultimate termination of this

21  litigation.  It ups the likelihood of having multiple piecemeal

22  appeals, as this issue is currently being briefed as to other

23  parties.  Addressing only one party's appeal as to these issues

24  without all rulings being considered together raises

25  uncertainty as to the application of any ruling that the Ninth

1    Circuit might enter regarding the state's claims, because while

2    there are some similarities between private plaintiffs' claims

3    and the state's claims, there are also some notable

4    differences.

5        We believe that the risk of inconsistent rulings and

6    inefficiency here is quite high, and we would urge the Court

7    to, at a minimum, if not deny this motion, to wait until this

8    issue is more thoroughly teed up for resolution when all the

9    pending motions to dismiss have been fully briefed and have

10   been decided by this Court.

11           **MR. WILLEN:**  May I briefly respond, Your Honor?

12           **THE COURT:**  You may, Mr. Willen.

13           **MR. WILLEN:**  Thank you.

14       Just briefly to address the things that my friends on the

15   other side said, with respect to the question of whether we've

16   tied together controlling issues and gone through the factors,

17   we absolutely have.

18       So just to take the product liability issue, that is, as I

19   said, a very clear legal question:  Are these services, are

20   these platforms' products, that is a question that is a

21   question of law that is resolved as such on the pleadings, is

22   it subject to substantial grounds of disagreement of a -- for

23   disagreement?  Clearly, yes, in the sense that it has been

24   decided in different ways by different courts, including by the

25   JCCP court, and would resolving that issue --

1          **THE COURT:**  Well, the JCCP court did not do the

2    analysis that the Court did.

3          **MR. WILLEN:**  That's absolutely --

4          **THE COURT:**  She took a different approach and a

5    different lens.  So that doesn't provide really any kind of

6    precedent, and I think Judge Kuhl would admit that.

7          **MR. WILLEN:**  Well, I absolutely agree that she took a

8    different approach, but I think that illustrates the question

9    of whether reasonable jurists can see this issue differently.

10          **THE COURT:**  And not only that, but it's not as if

11    my -- well, how long was that decision?  That I didn't -- that

12    I just did it by -- without citations to law.  I mean, there

13    are cases that clearly support the approach that I took and the

14    decision that I made, and I don't think that it's purely a

15    question of law, and I do think that any appellate court would

16    be better served by having a full record in trying to decide

17    where lines should be drawn.

18          Not only that.  It doesn't appear to me not only do you

19    not satisfy each of the three separate and distinct elements,

20    you may -- you may satisfy two, but termination of the

21    litigation is unlikely given the context of your appeal.  And I

22    do agree with the AG that this is entirely inappropriate, given

23    that we are still briefing and deciding these issues.

24          So the best case you have is that it's premature.

25          **MR. WILLEN:**  Well, just -- I mean, if your mind is

1    made up, there's -- I'm not going to convince you otherwise,

2    but I do think on the question of prematurity, the guidance

3    that the Court gave in the November 14th order is going to be

4    controlling with respect to the issues that are now being

5    briefed.

6              THE COURT:  Well, of course it is.

7              MR. WILLEN:  Right.

8              THE COURT:  Why wouldn't it be?

9              MR. WILLEN:  Absolutely.

10             THE COURT:  But just because you lose on a motion to

11   dismiss does not mean that you get to automatically appeal.

12   Otherwise, we would have hundreds of cases that are litigated

13   in a piecemeal fashion.  Not just this case, but all over the

14   circuits.

15             MR. WILLEN:  Yes, we absolutely agree with that, and

16   that's not -- our position is not just because we lost on

17   certain issues, that we automatically get a right to appeal.

18   What we tried to do is to identify some issues that we think

19   very clearly are legal questions on which courts have gone

20   different ways, and we think it --

21             THE COURT:  I don't think that any court has done the

22   kind of analysis that this Court did.

23             MR. WILLEN:  I agree.  Your Honor's analysis was very

24   sophisticated and distinct from the way that other courts have

25   looked at it.  The point that I think is important, though, is

1   that the bottom-line result, the question of whether product

2   liability law can apply to certain features of the defendants'

3   platform --

4           THE COURT:  And why would the Ninth Circuit take this

5   case, when we're still dealing with all the school district

6   complaints and the AG complaint?

7           MR. WILLEN:  Well, for two different things there.

8   One is to the extent that the issues that we've identified are

9   in fact controlling, then the sooner we can get resolution of

10   those issues, if in fact the Ninth Circuit is going to decide

11   them, the better all the parties are, because we'll have an

12   opinion from the court of appeals that --

13           THE COURT:  And so I'm supposed to stay all the

14   briefing on these topics?

15           MR. WILLEN:  No, not at all.

16           THE COURT:  Well, how is that not inefficient, then?

17           MR. WILLEN:  Because the -- most of the issues that

18   are raised are issues that are not ones that were resolved in

19   the November 14th order.  So where there's overlap, the whole

20   point is of course the November 14th order is going to guide.

21   Those -- we don't need to have those issues revisited by this

22   Court.  But if there is going to be appellate guidance on that,

23   the sooner we get that, I think the better for everybody.

24           THE COURT:  So you're not repeating your arguments.

25   Obviously I've not read your briefs.  I don't read anything

1    until it's ripe.  You've not repeated any arguments?

2         **MR. WILLEN:**  No.  We -- the presentation of the

3    arguments in the second wave of motions to dismiss are premised

4    on the rulings that the Court made.  We're not asking the Court

5    to -- we're not relitigating things that the Court has already

6    addressed.

7         **THE COURT:**  So Ms. Miyata, is there overlap or not?

8         **MS. MIYATA:**  Your Honor, I believe there is overlap.

9    The same arguments are made that Section 230 precludes claims

10   regarding certain features in which Meta argues that it is

11   acting as a publisher under Section 230.  There are certain

12   points on the First Amendment that are also raised in the

13   various motions to dismiss, not solely as to the state AGs, but

14   also as to other parties.  So I believe there is overlap.

15        And there is confusion, or there is potential confusion as

16   to whether any ruling regarding the application of Section 230

17   and the First Amendment would be identical in its application

18   to products liability law and its application to consumer

19   protection law and unfair and deceptive trade practices claims.

20        **MR. WILLEN:**  Just to that, I mean, what we're doing

21   in connection with the -- or what Meta is doing -- and I really

22   shouldn't speak for Meta because I don't represent them, but I

23   obviously have read the brief.  The Court obviously made

24   certain rulings that Section 230 bars a number of theories of

25   liability relating to certain of the platform features that are

| | |
|---|---|
| 1 | at issue, and so of course we're asking -- Meta is asking the |
| 2 | Court to apply that ruling to the similar features that are |
| 3 | alleged in some of the other complaints.  But that's different |
| 4 | from the question of whether the issues that we're challenging |
| 5 | are being relitigated somehow in this court, which they're not. |
| 6 | **THE COURT:**  Do I have a lawyer from Meta in the |
| 7 | courtroom? |
| 8 | **MR. SCHMIDT:**  You do, Your Honor. |
| 9 | **THE COURT:**  Do you agree with his assessment of your |
| 10 | position? |
| 11 | **MR. SCHMIDT:**  Yeah, in broad terms.  There's |
| 12 | absolutely -- |
| 13 | **THE COURT:**  You need to speak in the mic, and you |
| 14 | need to identify yourself. |
| 15 | **MR. SCHMIDT:**  I apologize, Your Honor.  Paul Schmidt |
| 16 | for Meta.  I was too eager to answer the Court's question |
| 17 | before announcing myself. |
| 18 | We do agree there's overlap.  Of course, there's overlap. |
| 19 | We have presented 230 and First Amendment issues, but we have |
| 20 | tried to do it in the way Mr. Willen described, guided by your |
| 21 | court's rulings, preserving obviously what we need to preserve, |
| 22 | but guided by your court's rulings and focusing on the areas |
| 23 | where we believe we would prevail under Your Honor's rulings. |
| 24 | **MR. LICHTMAN:**  May I respond, Your Honor? |
| 25 | **THE COURT:**  You may. |

1          **MR. LICHTMAN:**  On behalf of the individual

2    plaintiffs, what I can say is, without disputing Mr. Schmidt's

3    intentions here, our response to their opposition to dismiss as

4    currently drafted will, in fact, argue that many of the issues

5    that are being raised have already been decided by the Court,

6    and in fact, that certain of the arguments that they are making

7    on a motion to dismiss are barred by the Court's November

8    opinion.  So at least from our perspective it is absolutely not

9    accurate to say that we are not going to be getting into some

10   of the exact same issues that the Court addressed in November.

11         **THE COURT:**  Well, I guess we'll figure that out when

12   I see it.

13         All right.  A formal order will issue on the motion.

14         **VOICES:**  Thank you, Your Honor.

15         **THE COURT:**  Okay.  Next, we are going to go through

16   the issues that were raised in the CMC statement regarding

17   motion practice.  Do I have a lawyer here from Snap on the Snap

18   motion to dismiss Alice Doe, JS and DH's complaint?

19         **MR. BLAVIN:**  Yes, Your Honor.  Jonathan Blavin on

20   behalf of Snap.

21         **THE COURT:**  And let's have an appearance, please.

22         **MR. WARREN:**  Previn Warren for the personal injury

23   school district and local government plaintiffs.

24         **THE COURT:**  Okay.  Currently as I understand it those

25   three plaintiffs have, in accordance with the Court's order,

1    did reassert some claims that Snap is now moving to dismiss on;

2    is that right?

3          **MR. BLAVIN:**  That's correct, Your Honor.  On

4    January 2nd, three individual plaintiffs filed amended

5    short-form complaints in which they reasserted counts 12 and 14

6    against Snap, and those claims had been withdrawn from the

7    amended master complaint.

8          **THE COURT:**  Okay.  So you filed your motion on

9    January 12th, the consolidated opposition is due February 5th,

10   and I'd like to advance the reply so we can get started on it.

11   Typically you would get -- are we doing this on typical rules,

12   35, or did -- these are kind of standard page limits, right?

13         **MR. BLAVIN:**  That's correct, Your Honor.  I believe

14   the Court's prior order set the briefing deadlines for those.

15         **THE COURT:**  I know.

16         **MR. BLAVIN:**  Yes.

17         **THE COURT:**  But I set it not knowing whether anybody

18   was actually going to do this.

19         **MR. BLAVIN:**  Uh-huh.

20         **THE COURT:**  And we have a lot of motions, and this is

21   a discrete motion.  So you don't need, in my view, from

22   February 5th until February 26 to file an opposition.  It's

23   just Snap that has moved to dismiss.

24         **MR. BLAVIN:**  Correct, Your Honor.  We'd be happy to

25   move that date up.

```
 1            THE COURT:  All right.  February 15th is the revised

 2   date.

 3            MR. BLAVIN:  Okay.

 4            THE COURT:  So we can get a head start on it and

 5   everything's not coming in on the same day.  That's 10 days.

 6            MR. BLAVIN:  Thank you, Your Honor.

 7            THE COURT:  Okay?  Thank you.

 8        Your next issue is the request for early briefing on

 9   causation, and who is going to address that issue?

10            MR. SCHMIDT:  Paul Schmidt for Meta, Your Honor.

11   Good morning again.

12            MR. SEEGER:  Chris Seeger for plaintiffs, Your Honor.

13   Good morning.

14            MS. O'NEILL:  Good morning, Your Honor.  Megan

15   O'Neill for the state plaintiffs.

16            THE COURT:  Okay.  So I've read all of the letter

17   briefs.  Will somebody give me an update in terms of what was

18   discussed yesterday with respect to discovery, discovery

19   cutoffs, and whether or not there was any bifurcation relative

20   to causation.  So I have a new set.  All right.  So apologies

21   for that, but that's kind of -- I'd like to understand that

22   piece before talking about the briefing.

23        So I have Ms. Hazam.

24            MS. SIMONSEN:  Ashley Simonsen for the Meta

25   defendants on behalf of the defendants, Your Honor.
```

1          At yesterday's discovery --

2               **THE COURT:**  Hold on.

3               **MR. HUYNH:**  Good morning, Your Honor, Deputy Attorney

4     General Thomas Huynh on behalf of the State of New Jersey in

5     the state MDL for the state attorneys general.

6               **THE COURT:**  Okay.  So let me -- and that's Thomas

7     Huynh, H-u-y-m-h?

8               **MR. HUYNH:**  That's correct, Your Honor.  Thank you.

9               **THE COURT:**  Thank you.

10         All right.

11              **MS. SIMONSEN:**  Your Honor, at yesterday's discovery

12     management conference before Judge Kang, the Judge indicated

13     that he would direct the parties to further meet and confer on

14     limitations as to discovery.  With respect to a discovery plan,

15     the Judge indicated that he would defer to Your Honor to set

16     deadlines on general causation staging if Your Honor was

17     inclined to adopt that proposal by the defendants, recognizing

18     that any ruling Your Honor makes with respect to that issue

19     could affect the discovery deadlines that he is otherwise

20     planning to set.  He did not indicate what deadline he would

21     set for the cutoff of fact discovery but indicated that he is

22     inclined to enter an order setting a fact discovery cutoff more

23     in line with the plaintiffs' proposed discovery plan based on

24     their representation that they could get these cases to trial

25     by March of 2025, recognizing that Your Honor's orders on

1    bellwethers, a trial date, and again the general causation

2    staging that the defendants have proposed, could affect the

3    discovery fact cutoff that he sets.

4        And as Ms. Pierson is prepared to address further today,

5    we do seek Your Honor's guidance on those deadlines and would

6    request the opportunity to submit proposals on a broader case

7    management order for this MDL at the next case management

8    conference.

9        **MS. HAZAM:**  Your Honor, Lexi Hazam for plaintiffs.

10       If I may, there are a few matters that I need to correct

11   in that statement.

12       The first is that plaintiffs did not represent to the

13   Court yesterday that we would be prepared for a trial by

14   March 2025.  That was the close of all discovery in our

15   proposal.

16       To further clarify, Magistrate Judge Kang indicated that

17   he would be proceeding and setting a discovery schedule,

18   including fact and expert cutoffs, on the presumption that

19   there would not be prioritization of general causation, but of

20   course deferring to Your Honor as to the decision to be made on

21   that today with regards to defendants' request.  So I believe

22   he plans to proceed in issuing a discovery schedule, as he

23   said, more in keeping with plaintiffs' proposed deadlines, on

24   the assumption that there will not be such a prioritization.

25              **THE COURT:**  And in terms of the state proceedings, is

1    there a bifurcation?  My memory was that there was not

2    bifurcation on the state -- in the state proceeding.

3            **MS. HAZAM:**  I see, Your Honor.

4        In the JCCP there has not been any prioritization.  The

5    briefing that was submitted to Your Honor here was requested by

6    Judge Kuhl and has been submitted to her by the parties.

7            **MS. SIMONSEN:**  Your Honor, if I may add on that pint,

8    Ashley Simonsen for the Meta defendants.  Judge Kuhl did

9    indicate at the December case management conference that she

10   would entertain defendants' request to hear early expert

11   challenges, but that she would be interested in Your Honor's

12   guidance on the issue in connection with the briefing that's

13   been presented to Your Honor today.

14           **THE COURT:**  Judge Kuhl and I did have a nice dinner

15   last week, so she and I are aligned.

16           **MS. SIMONSEN:**  Thank you, Your Honor.

17           **THE COURT:**  Did you want to add something?

18           **MR. HUYNH:**  Thomas Huynh for the state attorneys

19   general.

20       Nothing, Your Honor.  Ms. Hazam stated exactly what we

21   would have said.

22           **THE COURT:**  All right.  So now back to the other

23   group.

24       Mr. Schmidt, again, we'll start with you.

25           **MR. SCHMIDT:**  Thank you, Your Honor.

1          **THE COURT:**  You shouldn't thank me, because again,

2    everybody -- so if you're first up, that means sometimes, and

3    maybe I should say frequently, that I'm not inclined to grant

4    your request.

5          **MR. SCHMIDT:**  I suspected Your Honor might say that

6    from the prior.

7          **MS. O'NEILL:**  Your Honor, if I may just interrupt

8    very briefly on a procedural point.  Again, this is Megan

9    O'Neill for the state plaintiffs.

10        Pursuant to your instructions at the previous case

11   management conference, the states do request leave to file a

12   responsive letter to the parties' briefing on this issue.

13         **THE COURT:**  Are you in support of early causation or

14   not?

15         **MS. O'NEILL:**  No, we are not.

16         **THE COURT:**  Then I suspect you're not going to need

17   that.

18         **MS. O'NEILL:**  That sounds great.  Thank you, Your

19   Honor.

20         **THE COURT:**  Let's go, Mr. Schmidt.

21         **MR. SCHMIDT:**  With those terms I will do my best,

22   Your Honor.

23         **THE COURT:**  So, you know, look, any federal judge, we

24   wake up in the morning and our day could look much different

25   than our day we thought -- than we thought our day was going to

1  look like.  So, I don't know, last week was it, I can't

2  remember anymore -- it was last week.  I thought I was going to

3  be spending the next three weeks in trial and got off the plane

4  and realized that my life had just expanded because my trial

5  went away.  So I've been able to spend a lot of time on this

6  case, and perhaps if I was in trial, I wouldn't have said,

7  Mr. Schmidt, you go first.

8      Go ahead.

9          **MR. SCHMIDT:**  Okay.  Thank you, Your Honor.

10     The reason this MDL exists is to evaluate the plaintiffs'

11  novel claim that we believe is unsupported by science that

12  specific features of defendants' services cause addiction and

13  cause other harms.  There's no dispute they're going to have to

14  prove general causation, they're going to have to prove it

15  through experts who will be subject to Rule 702 challenges.

16  And given the science, we are going to make those Rule 702

17  challenges.  We don't think they'll be able to overcome it.

18     And so what we've tried to do, guided by Your Honor's

19  rulings to date, is we have not proposed bifurcation.  We have

20  not proposed some kind of strict first-phase only on causation.

21  That's been done in a lot of cases.  We have not the proposed

22  that.

23     What we have instead proposed is a way, consistent with

24  Your Honor's comment about reaching legal issues, to reach this

25  fundamental legal issue earlier than we otherwise would, and to

1    reach it in a setting where the Court isn't faced with this

2    fundamental causation question in the context of also dealing

3    with a range of summary judgment motions and a range of other

4    expert witness challenges.  We believe that would meaningfully

5    progress this MDL in one of the most central questions in this

6    MDL, which is their allegation about causation.

7         And we cited authority recognizing this in our brief.  I

8    won't go back through it.  There's cases that have done this in

9    stricter form than we proposed, as I mentioned --

10              THE COURT:  There are cases on both sides, right?

11              MR. SCHMIDT:  There are cases on both sides,

12    absolutely.  Yes.

13              THE COURT:  So what that means is that the Court has

14    discretion.

15              MR. SCHMIDT:  Of course, the Court has discretion,

16    yeah.  And that's why I want to focus Your Honor on why we

17    think it's particularly appropriate in this setting, and

18    there's really four things I would say on that in terms of why

19    we've urged it in this MDL.

20         The first is why this MDL was created.  The JPML created

21    this MDL.  It was clear in the transfer order to address, among

22    other things, general causation.  The Court referenced, the

23    panel referenced general causation several times.  It

24    referenced *Daubert* motions, Rule 702 motions, several times.

25    And on that point, in the context where we're disputing with

the plaintiffs' counsel over whether this could be appropriate, we think it's relevant that the panel, the chair of the panel, Judge Caldwell, who signed the order, had herself just overseen an MDL that involved this kind of phasing.  One of the cases we rely on is from Judge Caldwell.

It's also notable that the plaintiffs themselves, plaintiffs in this courtroom, urged the creation of this MDL on this issue of general causation.  In Mr. Seeger's brief to the MDL, he said that all of these actions, regardless of the manufacturer, will share factual questions regarding general causation, in particular the biological mechanism of the alleged injury, the background science and common regulatory issues.  He actually cited in that brief to the MDL to the JPML urging creation of this MDL.  The *Zantac* case we rely on that involved phasing.  The *Viagra* case from this district that we rely on that involved phasing.  That's the first point.

The second point is this general causation issue runs through the plaintiffs' master complaint.  They plead general causation specifically.  They do so without invoking plaintiff-specific facts.  They plead that as an element of their claim, and they do that by relying, cherry-picking in our view, from studies that address general causation, that addressed this population-based question of can social media be linked to psychiatric injury.  That reinforces the centrality of this issue in this MDL.

1          The third point is the studies themselves.  As we noted in

2     our letter briefs, the studies themselves recognize how

3     contested this issue will be.  They recognize the challenge

4     that plaintiffs' experts, particularly under the new Rule 702,

5     will face in meeting their burden as to relying on their

6     testimony.

7               THE COURT:  In terms of you say the new Rule 702, 702

8     was amended to make it clear to district judges what the rule

9     actually is.

10              MR. SCHMIDT:  Yes.

11              THE COURT:  And was.  Substantively it hasn't

12    changed.

13              MR. SCHMIDT:  Yes.

14              THE COURT:  It was encouraging us to do more.

15         I have to say that in this district our judges were doing

16    it anyway.

17              MR. SCHMIDT:  Yes.

18              THE COURT:  And so I don't think in my view it's

19    changed.

20              MR. SCHMIDT:  Well, that's a really fair point, Your

21    Honor.  I absolutely agreed with how Your Honor framed the

22    rule.  I think what the rule does do is it underscores how

23    important this issue is, but it also speaks to some of the case

24    law that the plaintiffs cite in their brief.  Like they cite a

25    case called *Kocher* (phonetic) that's I think 16 years ago or

something of that order, almost 20 years ago.  I don't think a
decision like that would be decided the way it was with the
modern Rule 702.  But Your Honor's exactly right, we tracked
Rule 702.  We've been involved in actively briefing it.  It was
intended to codify what many judges were already doing, but it
does underscore these points about burden and the centrality of
this causation issue.

     And that brings me to their -- the studies and what the
studies show and how the studies track up against that burden
in Rule 702.  The studies recognize that the science in this
area is really inconsistent and that it doesn't show any kind
of the consistently positive effects the plaintiffs would
expect if they were able to prove their case.  And there's a
number of reasons for that.  One of them is the studies, many
of the studies they rely on don't tease out directionality.
They don't tease out is social media causing some kind of
psychiatric problem, or does some kind of existing psychiatric
problem influence how people use social media.

     And those themes come through even in the studies that the
plaintiffs cite in their own master complaint.  We flagged some
of those in our letter briefs to pick up on a few extra ones.
One of the studies they cite is called Keles, K-e-l-e-s.  It's
in Footnote 39 of the master -- of the amended complaint, the
amended master complaint.  It says:  "Twelve out of 13 studies
did not answer the review question, since they were cross-

1    sectional and unable to determine a causal relationship."

2        Another study, Levinson, makes the point I just made about

3    directionality.  It's cited in the master complaint at

4    Footnote 90:  "Because the findings presented here are cross-

5    sectional, it is not possible to determine whether social media

6    use contributes to sleep disturbance, sleep disturbance

7    contributes to social media use, or both."

8        And those kind of statements about fundamental limitations

9    in the science run through the studies that even the plaintiffs

10   rely on in their master complaint.

11       That brings me to my final point, which is simply that

12   given that this is why the MDL was created, or one of the core

13   reasons the MDL was created, finding some way for the Court to

14   reach it earlier in a setting where it's not -- the Court isn't

15   also forced and the parties aren't also forced to address other

16   issues, like plaintiff-specific challenges, like summary

17   judgment challenges, is consistent with the fundamental purpose

18   of this MDL in terms of getting guidance that will let the

19   parties progress the litigation to a conclusion, whether that's

20   ending cases or whether that's telling us that's not going to

21   be a basis to end cases.  When this is what the MDL is about,

22   getting that guidance early is consistent with the basic

23   purposes of --

24           THE COURT:  Well, maybe the problem I'm having with

25   the fact that you wanted to file these in January is your

1    definition of what early is.

2            **MR. SCHMIDT:**  Uh-huh.

3            **THE COURT:**  So what is your definition of early?

4            **MR. SCHMIDT:**  Our definition of early -- and we tried

5    to signal, and if we haven't, then I apologize, I'll say it

6    now.  We're flexible in terms of working with the plaintiffs on

7    this if this is something that the Court is open to.

8        What we think of as early is something that lets us get

9    guidance on this question before we start going all the way to

10   trial on individual cases that could be fundamentally impacted

11   by this question, and something that lets us present this

12   question to the Court outside the context of having to present

13   individual summary judgment motions, individual *Daubert*

14   motions, that kind of range of activity that would otherwise

15   happen in the lead-up to trial, where this can be a specific

16   focus for the Court and where it's a cross-cutting focus for

17   the Court.

18       The other extreme would be this just gets briefed with a

19   single plaintiff as they go to trial.  That might not even

20   apply in a meaningful way to a broad category of plaintiffs

21   beyond that individual in terms of the general causation issues

22   that get presented.  We think there's value --

23       (Simultaneous crosstalk.)

24           **THE COURT:**  -- *Daubert*s before trial, so how is this

25   any different?

1    So when you said -- when you want to file these in

2    January, when you file them in January and say, we want it

3    early, that says to me, we want to file this in the next couple

4    months.  I think that's a waste of time, and I'm not agreeable

5    to that.

6             **MR. SCHMIDT:**  Uh-huh.

7             **THE COURT:**  Now, closer to the end of discovery,

8    before summary judgment, before trial, having *Dauberts* heard, I

9    think that's probably appropriate.  But that would always be

10    appropriate.  That's not anything new.

11    So when you bring these letter briefs, you're suggesting

12    to me that you want something different than I would do

13    normally, and that you want to do it in the next few months,

14    and that I think is a waste of my time.

15    Let me hear from Mr. Seeger.

16             **MR. SEEGER:**  Your Honor, I'm going to keep this

17    brief, because frankly I'd like to address whatever questions

18    you might have.  But I don't agree with anything Mr. Schmidt

19    just said.  The schedule that he proposed to Judge Kang goes a

20    year beyond what we've proposed.  So I think it's in their

21    minds that they're going to play around with general causation

22    well past the schedule that we are proposing to complete

23    everything.

24    The other thing is I don't even understand how this Court

25    would decide a general causation issue outside the context of a

bellwether process, where you are looking at a case.  And
the -- you know --

            **THE COURT:**  Well, so what I -- let me say a couple of
things.

            One is that I understand that the evidence currently
alleged to support general causation takes two different kinds
of forms.  Experts, expert reports and testimony that the
plaintiffs will proffer to demonstrate that the defendants'
social media platforms are capable of causing the alleged
mental and physical harm and other kinds of harm.  And I went
back and looked again at the master complaint, you know, and
have a quarter inch of allegations.  And by that, I mean when I
printed out, you know, it's not the whole 278 pages, but
probably 50 pages of allegations that are supportive of
causation, including, you know, just off the top of my head
here, at 19, Footnote 13, Paragraphs 96 to 116, 392, 182, 219,
261, 272, and they go on and on.  So that's one.

            But the second portion is defendants' own admissions, and
that includes internal reports assessing the relationship
between product use and youth addiction and external comments,
there are whistleblower evidence, and those admissions will
matter, because these particular defendants in this particular
kind of case had more information than anybody else.  They,
themselves, are the experts.  And so until enough fact
discovery has occurred to understand what the defendants knew,

1    or thought they knew, it seems to me to be entirely premature.

2           **MR. SEEGER:**  And we've not contested that, Your

3    Honor.

4           **THE COURT:**  And not only that, but the defendants'

5    admissions I suspect will likely support causation.  And so I

6    am not going to be in a position to resolve factual disputes

7    that are better and appropriately decided by juries.  So I

8    think a lot still needs to be done before you should be coming

9    and asking for early resolution.

10         Now, if I have, right, if I have a quack, then obviously

11   it's my obligation to let you know that, no, that person does

12   not go -- cannot testify at trial.  And if they're using the

13   same experts for all of the cases, then obviously a *Daubert* to

14   deal with that particular expert is -- that's an appropriate

15   mechanism.  *Dauberts* are an appropriate mechanism to be used

16   and to test, but that doesn't mean that there won't be evidence

17   of causation given the defendants' own admissions.

18         So it's only one step before trial, and I haven't -- you

19   know, I haven't seen any reports.  I don't know what the

20   background of these individuals are.  And certainly just

21   because a party disagrees with another party's assessment

22   doesn't necessarily mean that that expert can't testify.

23         So I just think at this point it's entirely premature, and

24   until I know when we are going to have these cutoffs, yeah, I

25   always set *Daubert* motions with enough time, you know, to

1    resolve those issues before trial, but I certainly think it's a

2    total waste of time to do it in the next few months.

3            **MR. SCHMIDT:**  May I respond briefly on that, Your

4    Honor?

5            **THE COURT:**  You may.

6            **MR. SCHMIDT:**  Thank you.

7        Obviously I want to respond, because it's never -- we

8    don't litigate to waste the Court's time, and that's not what

9    we tried to do with this proposal.  That's not what we try to

10   do generally.  We weren't proposing that we do this in a couple

11   months.  I think we had proposed January be the date,

12   January 2025.  Plaintiffs, in a phasing proposal, then a

13   different proposal if there's no phasing, the phasing proposal

14   had proposed December '24.

15           **THE COURT:**  Yeah, but phasing doesn't make sense to

16   me either for the precise reason that I just explained to you,

17   which is that part of what the plaintiffs can appropriately use

18   are defendant's own documents.  And so it makes no sense to me

19   to phase and to bifurcate.

20           **MR. SCHMIDT:**  That's what I wanted to address next,

21   Your Honor.  There is actually very strong case law saying

22   having alleged admissions from companies doesn't allow you to

23   overcome the need to have reliable expert testimony.  There's

24   very good case law on that proposition.  And that's --

25           **THE COURT:**  And I take it, then, are you saying that

1  you are not going to -- and let me be very clear to you on this

2  point.  As in my patent cases, anybody who is internal to your

3  companies, all defendant companies, if you want them to provide

4  expert testimony, if you want them to use their expertise in

5  testifying, they must be identified as experts, they must

6  identify their opinions, and they must be subject to

7  deposition.

8          **MR. SCHMIDT:**  Understood, Your Honor.

9          **THE COURT:**  So be clear that that is, in my view,

10  especially with these tech companies, something that I

11  routinely do, because I won't have -- I won't allow you to use

12  it as an end run around different kinds of rulings with

13  externally paid third party experts.  So make a note.

14          **MR. SCHMIDT:**  I did.  We understand that, Your Honor.

15      Where I was going to go is notwithstanding this case law

16  on admissions, we've -- we don't think they need extensive

17  discovery, but we've not argued in this proposal with the

18  proposition that they would have time to conduct discovery on

19  those very points that Your Honor is addressing.  We're not --

20  we tried to set up our proposal to give them time to conduct

21  that discovery, and when we looked at different ways to stage

22  with them, we were within a month of each other of what that

23  time requirement would be.  So we're not resisting the

24  proposition that they would have time to conduct that

25  discovery.

1    What we are asking for is, as quickly as we can, with them

2    having that time, to find a way to put this issue before the

3    Court, and to the point Mr. Seeger was saying, not do it in the

4    context of an individual bellwether, where it gets mixed up

5    with every other issue in that bellwether, and it might not

6    actually give guidance, because it will be linked to whatever

7    the specific allegations are in that case as to the broader

8    MDL.  That's what --

9            THE COURT:  Well, again, you're talking about things

10   in a theoretical sense.  I don't know who their experts are.  I

11   don't know if they are relying on these experts for most or all

12   of their cases.  I don't know if the experts are going to be --

13   even if they have multiples, if they're all, you know, based on

14   the -- doing things based on the same thing.

15       So we can have this conversation.  I am meeting with you

16   monthly.

17            MR. SCHMIDT:  Yeah.

18            THE COURT:  But to give you a go-ahead at this

19   juncture I think is entirely premature.

20            MR. SCHMIDT:  All right.  We understand, Your Honor.

21       Our point is it's not hypothetical they're going to need

22   to meet this burden, it's not hypothetical that we're going to

23   challenge it, but I hear what Your Honor's saying, and we'll be

24   guided by that in looking for a way to reassert this at an

25   appropriate time in light of Your Honor's guidance.

1          **THE COURT:**  Did you want to say anything else,

2     Mr. Seeger?

3          **MR. SEEGER:**  No, Your Honor.

4          **THE COURT:**  Did you want to?

5          **MS. O'NEILL:**  Thank you, Your Honor.  Megan O'Neill

6     again for the states.  I'll be very brief.

7          I just wanted to add this is what our letter was going to

8     address.

9          **THE COURT:**  So Ms. O'Neill, you're going to have to

10    speak louder.

11         **MS. O'NEILL:**  Sorry about that.  I was hoping to

12    avoid it this month, but I guess I didn't.

13         To repeat, I'm Megan O'Neill on behalf of the states.

14         Very briefly, I just want to say that the state plaintiffs

15    also have concerns with efficiency and delays that could be

16    caused by the defendants' proposal, including related to how

17    the state plaintiffs would coordinate discovery with the

18    individual plaintiffs and how the proposal could affect delay

19    into discovery of the States' claims.  I'm happy to elaborate

20    on that if you would find it helpful, but otherwise I will

21    leave it at that.

22         **THE COURT:**  Go ahead.  I'm taking notes.

23         And Mr. Cuenco, do we have any old books or something

24    where we can raise that microphone?

25         **MS. O'NEILL:**  That might be helpful.  Thank you.

1              **THE COURT:**  Okay.  Let's see if that helps.

2              **MS. O'NEILL:**  Thank you, everyone.  Is that better?

3              **THE COURT:**  That's better.  Thank you.

4              **MS. O'NEILL:**  Great.  Thanks.

5          So again, just to be brief, we believe that the

6      defendants' proposal will introduce inefficiencies and the

7      potential for delay in a few different ways.

8          We first think that it will potentially impede

9      coordination between the state plaintiffs and the personal

10      injury or individual plaintiffs in general, as the personal

11      injury plaintiffs will be occupied with all things related to

12      general causation, including motions practice, preparing expert

13      reports, which would then divert resources and time away from

14      other aspects of the case for which they will need to

15      coordinate with the state plaintiffs in order for the case to

16      run efficiently.

17          In particular, it may complicate efforts to coordinate

18      discovery, which may be subject in part to collective limits

19      that the plaintiffs in general may share during this period,

20      where, under the proposal, certain issues would be prioritized

21      and other issues and claims would not.  We think that this is

22      likely to cause delay both because of the impact on

23      coordination and because of the mere fact that the private

24      plaintiffs' and the defendants' attention will be divided

25      between these general causation matters and the beginning

1    stages of discovery.

2         I think this is reflected in the parties' discovery plan

3    proposals, as has been mention by the other parties.  And even

4    within those deadlines that were proposed, the states are

5    concerned that prioritization of the general causation issues

6    will almost necessarily sideline and postpone discovery into

7    the states' claims.  And for these reasons, we think that the

8    defendants' proposal is -- to deviate from the normal course of

9    things is unwarranted, as Your Honor has mentioned before, but

10   also goes further in creating potential difficulties that would

11   not exist otherwise.

12        **THE COURT:**  Okay.  Let me just say for everybody's

13   edification, one of the reasons we have multiple judges working

14   on MDLs, and I have Judge Kang helping me, I do talk to him.  I

15   talked to him yesterday before he met with you all.  But I am

16   not going to read everything that you put in front of him, so

17   remember that.

18        I believe, Mr. Schmidt, the dates you were talking about

19   may have been in a submission to him, because I don't see

20   anything in the letter briefs.  So if there's something that

21   you need me to know, you need to make sure you can copy and

22   paste it, you can put it in a footnote, as long as it's

23   12-point font.  And sometimes I will have a chance to read

24   other things, but I don't think you can be certain that I've

25   read it just because you filed it on the docket.  There's just

```
 1    too many -- there are too many moving parts.

 2            MR. SCHMIDT:  Understood, Your Honor.  And this is

 3    one we candidly struggled with on our end in terms of what we

 4    presented to Judge Kang and what we presented to you, and we'll

 5    be guided in future presentations.  Thank you for that.

 6            THE COURT:  Okay.  So at this point the request is

 7    denied, but again, you know, it is not uncommon to resolve some

 8    of these issues in advance.  I just need -- I'm going to need

 9    substantially more information before giving you that deadline.

10            MR. SCHMIDT:  Understood, Your Honor.

11        And if we may, at an appropriate time, we know they're

12    going to have to come forward with experts.  We'll come back to

13    you and ask for relief on that.

14            THE COURT:  And it also helps me.  I mean, if I'm

15    going to do *Daubert*s, you know, not having everything come into

16    chambers at the exact same time helps me, you know, resolve

17    your issues and keep you moving forward, which is the point,

18    without being inundated.

19            MR. SCHMIDT:  Yes.

20            THE COURT:  That's why I'm trying to make sure that,

21    like I, you know, moved the Snap reply deadline while we're

22    doing the claims against Zuckerman first.  I only have so much

23    help.

24        So in any event, it's not beyond the realm of

25    possibilities, but it's certainly way too early for it.
```

1          **MR. SCHMIDT:**  Okay.  And that's really what was

2    motivating us, Your Honor, is that desire to not have

3    everything come in at once, have this be a subject of attention

4    and have it be something case MDL-wide as opposed to just one

5    case.  So we'll be guided by that.  I appreciate that guidance.

6          **THE COURT:**  Okay.

7          **MR. SEEGER:**  I just want to make clear, Your Honor,

8    that my lack of comments isn't that I didn't have a lot to stay

9    about this, it's that I know my tenacious friend, Paul Schmidt,

10   will probably raise this every month until it's finally

11   decided, so I'll save it for them.

12         **MR. SCHMIDT:**  We will not raise it next month or the

13   month thereafter.

14         **THE COURT:**  I was going to say, I'd suggest not.

15         **MR. SCHMIDT:**  Your Honor doesn't need to worry about

16   that.

17         **MR. SEEGER:**  Thank you, Judge.

18         **THE COURT:**  Okay.  All right.  The next, there's a

19   sealing of the Tiktok complaint that got ...

20         **MS. HAZAM:**  Lexi Hazam for plaintiffs, Your Honor.

21         **MS. HARRIS:**  Good morning, Your Honor.  TaCara Harris

22   for the Tiktok defendants.

23         **THE COURT:**  Okay.  Let me ... okay.  From King &

24   Spalding?

25         **MS. HARRIS:**  Yes, Your Honor.

1          **THE COURT:**  All right.  I don't think there's any --

2     is there any real dispute here on that?

3          **MS. HAZAM:**  There is not, Your Honor.  There is a

4     brief update that I don't think affects entry of the

5     stipulation.  I believe counsel are in agreement on that.  And

6     that is that there were certain portions of the previously

7     under-seal Utah complaint that had not been incorporated by

8     reference by the plaintiffs in their filing that have now been

9     unsealed, and I believe that it is the intent of the parties

10    that the document that is now filed pursuant to the stipulation

11    will unseal those sections, but the parties have made clear

12    that the plaintiffs were essentially not agreeing to the

13    sealing of anything that was unsealed in Utah regardless, and

14    therefore the current language of the stipulation remains

15    suitable.

16          **THE COURT:**  Agreed?

17          **MS. HARRIS:**  Yes, Your Honor, we agree.  However, if

18    the Court would like an updated stipulation and proposed order

19    so that it's clean, we're happy to provide that.  We've

20    prepared that and shared it with the plaintiffs' counsel late

21    last night once we learned of the unsealed complaint being

22    filed in Utah.  So we're happy to replace it with an amended

23    stipulation and proposed order if that would be helpful for the

24    Court.

25          **THE COURT:**  Well, we just want to be accurate, so why

1  don't you go ahead and do that.  You know, if you can do it by

2  the end of today.

3          **MS. HARRIS:**  Yes, Your Honor.

4          **THE COURT:**  And then once we see it -- and make sure

5  that you've withdrawn the last one in that so that everything

6  gets terminated appropriately.  Okay?

7          **MS. HAZAM:**  Will do, Your Honor.

8          **MS. HARRIS:**  Will do.

9          **THE COURT:**  And we will issue order.  All right?

10          **MS. HARRIS:**  Your Honor, also, I don't want to speak

11  for Meta and Ms. Simonsen if you have something to add.  Meta

12  also filed a stipulation with the plaintiffs.  I believe there

13  is no dispute there, but if Ms. Simonsen has something to add,

14  I'll defer to her on that.

15          **THE COURT:**  No, nothing.

16      Okay.  All right.  I had only seen the Tiktok one, so

17  Ms. Simonsen, do you have the docket number for the Meta?

18          **MS. HARRIS:**  Defense:  It's 540.

19          **THE COURT:**  So Meta's is 540 and Tiktok is?

20          **MS. HARRIS:**  542 and 543.

21          **THE COURT:**  Okay.  And do --

22          **MS. HARRIS:**  Your Honor, 543 will be the one that we

23  will replace today.

24          **THE COURT:**  Okay.  And does -- do I need a

25  replacement on 540?

```
 1                 MS. HAZAM:  No.

 2                 MS. HARRIS:  No, Your Honor.

 3                 MS. HAZAM:  And we agree we do not need any

 4    replacement on the Meta stipulation.

 5                 THE COURT:  Okay.  So the stipulation at 540 is

 6    granted, 542 is granted, and we're waiting on 543?

 7                 MS. HAZAM:  Exactly, Your Honor.

 8                 THE COURT:  543 is withdrawn?

 9                 MS. HARRIS:  Yes, Your Honor.

10                 THE COURT:  543 is withdrawn.  All right.  So we'll

11    wait for the next one.  Great.

12                 MS. HAZAM:  Thank you.

13                 MS. HARRIS:  Thank you.

14                 THE COURT:  There's a motion, or someone's requesting

15    a motion for remand be briefed.  So who do I have on the remand

16    issues?

17                 MR. BLAVIN:  Thank you, Your Honor.  Jonathan Blavin

18    again on behalf of defendant Snap.

19                 MS. SCULLIAN:  Good morning, Your Honor.  Jennifer

20    Scullian.  I just wanted to actually introduce Edward Chen, who

21    is counsel for the Youngers plaintiffs, who are looking to make

22    the motion for remand.

23                 MR. CHEN:  Good morning, Your Honor.

24                 THE COURT:  Mr. Chen, since you're primary, why don't

25    you go to the primary mic.
```

1          Okay.  Well, Mr. Blavin, I wish I could say you don't have

2     to start first, but once again you need to start first.

3          **MR. BLAVIN:**  Understood, Your Honor.

4          **THE COURT:**  So here's the issue.  I don't know that

5     remand is appropriate at all, but I do know that it is -- we,

6     as MDL judges, are encouraged to actually address these remand

7     issues early.  And so my inclination is even though I don't

8     know that it has any merit whatsoever, Mr. Chen, especially,

9     you know, given this case, it seems to me I'm obliged to let

10    them file their motion and address it.  That's what we've been

11    advised, that we are supposed to let people file these motions,

12    and we're supposed to take care of them pretty quickly.

13          **MR. BLAVIN:**  And I appreciate that perspective, Your

14    Honor.  One thing I would note is MDL courts do often decide to

15    hold those motions pending resolution of broader, more cross-

16    cutting issues.  Judge Orrick did this in the *Juul* litigation.

17    He noted that there's efficiencies to be gained through the

18    processes that are already underway in the MDLs for all cases,

19    regardless of when they might be remanded.

20          And the Youngers motion, again, it's the only remand

21    motion here.  It's not as if Your Honor has dozens of these

22    pending.

23          **THE COURT:**  Yes.

24          **MR. BLAVIN:**  And Your Honor, as you've mentioned, has

25    limited resources.  There's hundreds of pages of additional

1    briefing that Your Honor is working to get through on various

2    motions.

3        So what we would request is at a minimum, until the Court

4    resolves all of that initial motion practice, which again,

5    cross-cutting issues which very well could affect the Youngers

6    case itself in the event it is potentially remanded, it makes

7    more sense from an efficiency perspective to just hold that

8    motion until all of this other motion practice is completed.

9    At that point in time, the Court could consider the remand

10   motion, and there's efficiencies to be gained through that

11   process, as well.

12           **THE COURT:**  Well, are there -- this is New Mexico,

13   right?

14           **MR. CHEN:**  Yes, Your Honor.

15           **THE COURT:**  There are hundreds of cases pending in

16   California, so those plaintiffs have had the ability to remain

17   or to stay in state court as opposed to coming to federal

18   court.  Are there cases in -- other cases in New Mexico that

19   are proceeding?

20           **MR. BLAVIN:**  There is one case in New Mexico that I'm

21   aware of involving Snap which is proceeding.  That is the only

22   case in New Mexico that I'm aware of.

23           **MR. CHEN:**  Our firm's litigating that case, Your

24   Honor.

25           **THE COURT:**  So, and what would be the basis for

1  remand?

2          **MR. CHEN:**  Your Honor, this is -- first of all, this

3  is a -- this involves a minor.  It's a wrongful death case.

4  The minor committed suicide, and we represent the parents and

5  the estate, of course.  And we also not only sued the social

6  media defendants, but we also sued three individual New Mexico

7  residents who performed acts that we believe, in combination

8  with what the social media companies have done and provided

9  through their platforms, contributed to her suicide, to the

10  addiction, to the suicide involving the transmission of

11  sexually explicit photos and other activities.

12          So the facts are highly intertwined, and we believe that

13  it's -- there's -- I don't think there's any dispute that

14  there's complete diversity, they just want to -- want the Court

15  to basically disregard the presence of these three individual

16  defendants that are co-defendants with them.  They have a high

17  burden to meet to show that removal is -- that the removal

18  statute is satisfied.  We certainly think our motion's

19  meritorious.

20          The *Juul* case that defendants' counsel referenced, in that

21  case there were eight remand motions, and the Court in that

22  case thought that you needed to have a critical mass, perhaps,

23  to then address those.  Well, there are no other remand motions

24  other than ours.  We have critical mass.  This is the

25  appropriate time to take up that motion, and we think it would

1    be an injustice to have this case proceed for another year or

2    longer, only to then address this remand motion and find out

3    that we should have been in New Mexico all along.

4            **THE COURT:**  So the request to file the motion is

5    granted.  You will use our normal Northern District protocols

6    for filing, 35 days' notice.  There will be no argument on this

7    motion unless I schedule it.  I rarely, if ever, grant argument

8    on motions for remand.  And we will work it in in between all

9    our other proceedings.

10           **VOICES:**  Thank you, Your Honor.

11           **THE COURT:**  All right.  You wanted to talk about

12   bellwether protocols.  So I have Ms. Hazam for the plaintiffs,

13   and who do I have for the defense?

14           **MS. PIERSON:**  Good morning, Your Honor.  Andrea

15   Pierson from Faegre Drinker for Tiktok.

16           **THE COURT:**  Okay.

17           **MR. LEWIS:**  Good morning, Your Honor.  Chris Lewis,

18   Kentucky, for the states.

19           **THE COURT:**  Okay.  All right.  Well, who wants to

20   start?

21           **MS. HAZAM:**  Your Honor, Lexi Hazam on behalf of

22   plaintiffs.

23       The entry regarding this issue in the case management

24   statement indicates that the parties wish to seek the Court's

25   guidance on the desired process and timing for submission of a

proposed bellwether protocol.  I think that summarizes, in

fact, the request.  There is a bellwether process in its

initial stages in the JCCP court.  Plaintiffs would like to

begin discussions of a process here, as well.  We believe that

there are probably parts of that process that are appropriate

for this Court, including, of course, trial dates and dates for

dispositive motions.  There may be parts of the process that

are more appropriate for Judge Kang's court, such as discovery

deadlines.

It was defendants' suggestion when we raised this as part

of our meet and confer leading up to the discovery conference,

that it should be submitted to Your Honor principally, and we

discussed that briefly with Judge Kang yesterday.

I believe the defendants have indicated that they think

that there should be a large number of PFSs completed before

this process even begins.  We would acknowledge that there's a

role for PFS data as part of this process, but we believe the

parties can begin talking now about the kinds of categories

that might be used in some features of that process.

**MR. LEWIS:**  Your Honor, Chris Lewis again for the

states.  We're in agreement with the plaintiffs on this.  We do

want to move forward with that process.  We'd like the states'

case to be prioritized and considered potentially as a

bellwether in the case, and we would like to see this process

moved along.

1          THE COURT:  Do I have anybody from the school

2   districts?

3          MS. HAZAM:  Your Honor, you do have our co-chairs in

4   the courtroom, and we are prepared as leadership to speak on

5   this, as well.

6          THE COURT:  All right.  So what is your thought in

7   terms of individuals versus school district cases?

8          MS. HAZAM:  I believe we would like to discuss that

9   further before announcing our intent on that to Your Honor.  I

10  can say generally speaking that we would like them to be

11  prepared simultaneously; that we would like pools to be

12  underway at the same time, in part, so that if any particular

13  case does not end up going to trial, there are other cases

14  ready from all categories of plaintiffs.

15         THE COURT:  And when are you going to trial in front

16  of Judge Kuhl?  She asked you to give her a date at your last

17  conference; you failed to do that.  So when are you going to be

18  ready?

19         MS. HAZAM:  Your Honor, I'm sorry, I am not

20  responsible for trial dates in the JCCP.

21         THE COURT:  Anybody here on the California cases?

22         MS. HAZAM:  I should say, Your Honor, that a number

23  of us have cases in the JCCP.  We simply don't speak for it at

24  that level.  I have attended, at least remotely, all of the

25  JCCP hearings, and my understanding was that the plaintiffs

had, in fact, proposed dates past the selection of bellwethers
in what they submitted to Judge Kuhl, and that she indicated at
the last hearing that she did not want to proceed further with
dates for motions and experts yet.  She wanted to discuss the
dates for the bellwether selection process and not move beyond
that at this time.

          **THE COURT:**  All right.

          **MS. PIERSON:**  Thank you, Your Honor.  Andrea Pierson.

     I thought it might be helpful, Your Honor, to talk a
little bit about the conference that we had with Judge Kuhl on
Wednesday of this week.  It's been a busy week in these cases
obviously, and a lot has happened in a short period of time.

     Ms. Hazam is correct that Judge Kuhl wanted to take an
incremental step and focus on the bellwether process, the
discovery pool process and the bellwether process, and we had a
very productive and formal discussion with her about that on
Wednesday.  We talked about potential discovery pool categories
and also gradations within those categories.  In particular,
the plaintiffs presented their thoughts on factors that may
influence gradations of cases, things like frequency of use of
the platforms, duration of use and age at first use.  And the
defendants discussed with Judge Kuhl proposed categories for
discovery pool discovery that are really based on the key issue
of how can we get to the question of causation of the 13 injury
types that the plaintiffs allege in this litigation.

1        After a robust conversation with Judge Kuhl involving a

2   whiteboard and a lot of roundtable discussion, Judge Kuhl

3   ordered the parties to confer and to build the outline of a

4   structure or grid based on that discussion and to report back

5   to her on February the 7th.  The three categories that we'll be

6   focusing on for discovery pool discovery center around

7   plaintiffs who allege injuries plus an eating disorder in one

8   category, a second category of plaintiffs who allege various

9   injuries and a sleep disorder of some sort and a second

10  category, and then a third category that is comprised of

11  plaintiffs who allege various injuries, including both an

12  eating and a sleeping disorder.  And the focus on those

13  categories is really driven by the data, Your Honor, that comes

14  from the short-form complaints that have been submitted in the

15  JCCP.  Judge Kuhl ordered us to put on the vertical part of the

16  grid those three categories, and then on the horizontal or top

17  of the grid, the factors that the plaintiffs believe will

18  influence the gradation of the alleged injuries.

19       Upon conclusion of receipt of the PFS data for the

20  currently filed cases, as well as presentation of the DFS data

21  from the defendants, then the parties will populate the grid

22  that Judge Kuhl has asked us to prepare.  Once that grid is

23  populated, then we'll meet with Judge Kuhl again, and at that

24  time we'll look at the data in a holistic way from the PFS and

25  DFS and talk again about the three categories that we've really

1    narrowed in on for purposes of this discussion.

2              **THE COURT:** So we don't have anything with respect to

3    the gradation at this point?

4              **MS. PIERSON:** We don't, Your Honor.  That information

5    will come through the plaintiff fact sheets.

6         I think it's helpful to understand, too, Your Honor, what

7    the anticipated timing is of those things, because it is -- I

8    think both sides agree it's critical to have that information

9    for both the PFS and the DFS to be in a position to confirm

10   that these categories are the right categories and that as we

11   choose discovery pool cases out of that grid, that in fact

12   they're representative of the greater litigation.

13        So in terms of timing, plaintiff fact sheets in the JCCP

14   will be received for the currently filed cases at the earliest

15   possible date is March the 28th.  I think the defendants

16   believe that that's probably more likely to bleed into April

17   and May.  So the PFS process in the JCCP is likely to extend

18   from late first quarter to early into the second quarter.

19        Then the defendant fact sheet process has not yet really

20   been established yet in the JCCP.  The parties are to submit

21   competing proposals and disagreements to Judge Kuhl on February

22   the 7th.  After that time, we anticipate that she'll hold

23   another informal discovery conference to work through the

24   disagreements and to make decisions calling the balls and

25   strikes in March.  So we're likely to have a final DFS and a

1    DFS implementation order it seems like in probably late March

2    or sometime in April.

3         Our next conference with Judge Kuhl is February 7th, and

4    then the conference after that is March the 15th.

5         So completion of the DFS process we think is likely to

6    extend into late second quarter or early third quarter of this

7    year.  Once we have that information, as I said, Judge Kuhl

8    intends to take a step back, look at the populated grid, look

9    at the representativeness of the categories, and then she'll

10   choose discovery pool cases to go within each of those three

11   categories.

12        The plaintiffs have proposed that there would be 66 cases

13   in total in those three pools.  The defendants have proposed a

14   larger number at 90 to account for what we believe will be some

15   dismissals and potential motion practice.  Wherever that number

16   lands, though, not until the cases are slotted into the three

17   discovery pools will actual discovery begin on those cases.

18        We're not sure yet how long that discovery will take of

19   the bellwether discovery pools.  Judge Kuhl indicated at our

20   last hearing a desire to complete that discovery within three

21   months.  That, of course, will depend on things like how

22   quickly can we collect medical records.  Which, we know that

23   process can take a couple of months at minimum.  And then, of

24   course, there will be written discovery, plus depositions of

25   the plaintiffs and key witnesses, like parents and key treating

1    physicians.

2         Upon the completion of that process, then Judge Kuhl will

3    select the bellwether cases for trial, and there will be

4    additional discovery of the cases that are chosen for

5    bellwether trial.  That will take a period of months, as well,

6    to complete that work.

7         We've not discussed with Judge Kuhl yet things like

8    deadlines for *Sargon* motions or motions for summary judgment,

9    but we know that needs to be built into the process, as well.

10        So there's a lot happening in the JCCP in terms of

11   scheduling to get us to the point that we're in a place to

12   select the discovery pool cases and eventually bellwether

13   trials.  We're obviously happy to start that conversation in

14   this proceeding simultaneously, though, and certainly as we

15   begin to get PFS data and DFS data in this proceeding, it will

16   help to inform our thinking about how we can get to those core

17   questions of causation in the cases.

18        It is a little complicated, though, Your Honor, as you can

19   see, because we have a schedule that we're working on with

20   Judge Kuhl that relates to the bellwether workup and discovery

21   of the plaintiffs in that instance, and then at the same time

22   we've been discussing, as Ms. Simonsen explained, the discovery

23   plan with Magistrate Kang.  And then, of course, ultimately

24   your own trial calendar is critically important to this

25   process.

1          **THE COURT:**  Well, this case is a priority case, so

2     you don't worry about my trial calendar, other than criminal

3     cases.  They will always take priority.

4          **MS. HAZAM:**  Your Honor, if I may?

5          **MS. PIERSON:**  Thank you, Your Honor.

6     If I can just finish, please?

7          **MS. HAZAM:**  Thank you.

8     What might have gotten --

9          **THE COURT:**  No.

10          **MS. HAZAM:**  I'm sorry.  Excuse me.

11          **THE COURT:**  Finish.

12          **MS. PIERSON:**  Thank you, Your Honor.

13     Just to -- as I was saying, there are these three

14     different schedules that we're looking at, obviously, and

15     working to ensure that they dovetail together.  And so the

16     defendants' request today, Your Honor, is that we confer with

17     the plaintiffs and that we provided to the Court before the

18     next status conference a proposed schedule for the litigation,

19     something that would include deadlines, like Rule 702 motions

20     and motions for summary judgment, and that we start to target

21     those deadlines in combination with the schedule for the

22     bellwether plan.

23     We agree that these conversations should be happening in

24     parallel with plaintiffs, but I think it would be helpful if we

25     were able to think holistically about the schedule so that we

1    can ensure that the pieces of this puzzle, between the good

2    work that Judge Kuhl is doing, the good work that Magistrate

3    Kang is doing and the good work that's being done in this

4    court, so that we can ensure that those deadlines are actually

5    fitting together.

6         So that's our request, Your Honor.

7              **THE COURT:**  Now, you may.

8              **MS. HAZAM:**  Thank you, Your Honor.  And I apologize

9    for interrupting earlier.

10        What I think may have been lost in that lengthy

11   explanation is that Judge Kuhl, in fact, indicated on the

12   record prior to the hearing this week that she anticipated that

13   bellwether discovery would get underway this June and be

14   largely completed at the end of the summer, as the JCCP

15   plaintiffs had proposed.

16        Also, while I was not present in the in-chambers session,

17   and I believe Ms. Pierson likely was, because I can't speak

18   firsthand about it, but I can say that reports from various of

19   our colleagues indicated that she did not select defendants'

20   injury categories as the set-in-stone categories that would be

21   used in this case.  They were a proposal from the defendants.

22   Plaintiffs were focused on age, duration of use and length of

23   use, which would certainly be one of the axes that Judge Kuhl

24   wanted to see in a graph format.  The other axes would be some

25   form of severity of injury, but not necessarily adopting the

1    defendants' three categories as just explained.

2        I think at the end of Ms. Pierson's statement, we saw this

3    discussion of starting to work on a discovery plan morph into

4    perhaps something that would be seeking to change Judge Kang's

5    anticipated order about the overall discovery schedule, and

6    plaintiffs do not believe that would be appropriate and would

7    await his order as he indicated yesterday, especially given

8    that Your Honor is not inclined at present to prioritize

9    general causation.

10        Plaintiffs are simply requesting today that we begin this

11    conversation and perhaps have a deadline to start submitting a

12    plan, both the components that might go to Your Honor and the

13    components that might go to Judge Kang.

14            THE COURT:  I'd like to hear from the AGs.

15        MR. LEWIS:  We're in agreement with that, Your Honor,

16    with Ms. Hazam's statements.

17            THE COURT:  Let me ask you this, though.  If the AGs

18    went first, when would you be ready for trial in your view?

19        MR. LEWIS:  May I confer?  Thank you.

20        Your Honor, we believe by spring of next year.

21        MS. HAZAM:  Your Honor, if I may, the proposal that

22    plaintiffs made jointly to Judge Kang regarding the discovery

23    schedule, which he indicated he would lean more towards in

24    entering his order, had discovery completed as of March of next

25    year.

1      **THE COURT:**  Well, if the plaintiffs individually and

2  the school districts can't get to trial by the spring of next

3  year, that's fine.  If the AGs can, that's fine, too.

4      **MS. HAZAM:**  I don't necessarily think that's what

5  we're saying.  We had jointly proposed with the AGs having

6  discovery end by March 1st of next year.  And so once discovery

7  ends, we may still have dispositive motion practice, but we

8  were anticipating that might mean trial as early as early

9  summer.

10      **THE COURT:**  That wasn't my question.

11      **MS. HAZAM:**  Okay.

12      **THE COURT:**  My question is -- because the AG's case

13  is distinctly different.

14      **MR. LEWIS:**  Correct.

15      **THE COURT:**  Different kinds of claims.  Different

16  issues.  I want to know when you think you would be ready for

17  trial.

18      **MR. LEWIS:**  We believe we can be ready for trial in

19  spring of next year.

20      **THE COURT:**  All right.  That is different.  That's

21  something over which you don't control.

22      **MS. HAZAM:**  I don't purport to control it.

23      Our proposal to Judge Kang was that by early spring next

24  year we would be complete in discovery, and therefore we would

25  be prepared to go to trial on a similar timeframe.  It might

1    not be March 1st, but it would be late spring potentially.

2         So I think we are actually closely aligned in schedule,

3    because we proposed the same discovery timeframe.  And we are

4    proposing that bellwether discovery happen concurrently with

5    fact discovery, so that it does not delay getting to trial any

6    further.

7         I would also note that Judge Kuhl has indicated to the

8    parties that she doesn't believe that we need to wait for all

9    PFS data to be in in order to have productive discussions and

10   start entering into a protocol.

11        **THE COURT:**  Well, and there's no PFA data for the

12   school districts.  The school districts' track is also

13   distinctly different from the individual tracks.  So why can't

14   the school districts be ready sooner than the individual

15   plaintiffs?

16        **MS. HAZAM:**  Your Honor, I believe that they can be

17   ready at least on the same schedule as the personal injury

18   plaintiffs.  The PF --

19        **THE COURT:**  I asked a different question.  All right?

20   You don't have personal injuries for the school district cases.

21        **MS. HAZAM:**  Correct, Your Honor.

22        **THE COURT:**  So that discovery is distinctly

23   different.  Why wouldn't that -- why wouldn't the school

24   district cases be ready to go earlier than the individual

25   cases?

1          **MS. HAZAM:**  Okay.  Your Honor, respectfully, in our

2    view the discovery on individual plaintiffs and on the school

3    districts is approximately commensurate, and so we anticipate

4    that they could be ready at approximately the same trial for

5    trial.  And that is our goal, to have all tracks --

6          **THE COURT:**  What are the alleged damages?

7          **MS. HAZAM:**  They are damages arising largely from

8    public nuisance claims and from negligence claims.  So they are

9    damages that could take the form of abatement of a nuisance,

10   which can be injunctive relief, or it can be monetary damages

11   to put programs into place in the schools to deal with this

12   problem.  In other words, increase mental health services and

13   the staffing for them, the costs that are incurred in so doing,

14   the costs incurred in providing training programs to teachers,

15   to students, monitoring students' use of social media as may be

16   necessary, addressing disciplinary problems, et cetera.

17       It's been our belief throughout that all three categories

18   of plaintiffs would be prepared for trial on the same timeline,

19   and that's why we proposed a joint discovery schedule to

20   Magistrate Judge Kang.

21         **MS. PIERSON:**  Your Honor, may I respond to just a

22   couple of points please?  Andrea Pierson.

23         **THE COURT:**  You may.

24         **MS. PIERSON:**  Your Honor, just to clarify a couple of

25   things.

1        First of all, in the JCCP there is no plaintiff fact sheet

2   yet for the school districts.  The parties will submit proposed

3   fact sheets and disagreements to Judge Kuhl on March the 27th.

4   Her practice so far has been to receive those submissions and

5   then to sit down with the parties in an informal conference to

6   try to work through those differences.  So it seems likely to

7   me that the earliest that we'll have even a form for a

8   plaintiff fact sheet in the school district cases is probably

9   sometime in April, maybe even in early May.

10          THE COURT:  Well, why can't we do it sooner here?

11          MS. PIERSON:  Those conversations are happening in

12   parallel for both proceedings.

13          THE COURT:  I understand.  But Judge Kuhl is -- and

14   the reason you have them earlier for the individuals is that

15   that's where her focus is.  She doesn't have an AG case.  She

16   does not have the same number of school district cases.  So we

17   can, here in the federal court, provide some leverage and focus

18   on the school district cases so that she can keep doing her

19   great work on the individual cases.  That would be my

20   preference.

21          MS. PIERSON:  Your Honor, let me pause and let my

22   colleague, Ms. Simonsen, address the AG cases.

23          MS. SIMONSEN:  Thank you.  Ashley Simonsen for the

24   Meta defendants.

25          I just wanted to indicate, Your Honor, that what I heard

from the state AGs just now about desiring to go to trial, I
thought I heard him say, on all of their cases by the spring of
2025, is not something that -- it's the first I'm hearing of
that.  At one point, I think they had suggested they'd be
involved in bellwether process in a different way.  And we
haven't had an opportunity to confer with them on how a trial
of the state AG cases would appropriately proceed and would
request the opportunity to confer with them on that and get
back to Your Honor.

I would also like to note that the joint proposal for a
trial in the spring of 2025 that all three sets of plaintiffs
proposed to Magistrate Judge Kang assumed that there would be
no discovery of the state attorney generals in terms of
depositions.  That was the position that they took.  Magistrate
Judge Kang did indicate yesterday that of course discovery of
the state attorneys general -- and there are 34 of them --
would be appropriate, since they are parties suing the Meta
defendants.

And so I would submit to Your Honor that taking into
account all of the discovery that needs to happen on the
personal injury plaintiffs with the fact sheets, the defendant
fact sheets, on the school districts with the plaintiff fact
sheets and then a bellwether workup, in conjunction with the
discovery that the defendants will need to take of the state
attorneys general, a trial in spring of next year does seem

1    unrealistic.  We would request an opportunity, again, to confer

2    further with the plaintiffs, taking into account all of these

3    different pieces and how they fit together.

4         **THE COURT:**  All right.  I'm not exactly sure why you

5    haven't done it already.  Why haven't you done it already?

6    We're here today, so why are you coming to me today and saying,

7    oh, we want to confer?  So why hasn't it been done already?

8         **MS. SIMONSEN:**  Your Honor, we had understood that we

9    should first speak to Magistrate Kang about, you know,

10   discovery deadlines and things like that.  Magistrate Judge

11   Kang did encourage us to come to Your Honor to ask for guidance

12   on whether you would like us to begin discussing a trial

13   schedule, and we are glad to do that and would simply request

14   an opportunity for all of the parties to come together, discuss

15   that and present something to you at the next case management

16   conference.

17        **THE COURT:**  No, it's going to be sooner than that.

18        **MS. HAZAM:**  Your Honor --

19        **THE COURT:**  I'm out of trial, so that means I can

20   focus on your case.  So you're gonna get one week, one week to

21   confer.  Today is Friday.  I want something filed by next

22   Friday.  There's no need for us to be waiting on these issues.

23   So February 2nd.

24        **MS. SIMONSEN:**  And, Your Honor, do I understand

25   correctly that you'd like us to propose trial dates for the

1    beginning of the personal injury lawsuits, the school district

2    lawsuits and the state attorney general lawsuits?

3              **THE COURT:**  So here's -- I will tell you that because

4    I know Judge Kuhl is focused on those -- on the individual

5    lawsuits, I would do it the following.  I will prioritize

6    school district and AG lawsuits over the individuals.  That

7    doesn't mean that they shouldn't all be ready.  It seems to me

8    that a single trial date for all the AGs, let's say a dozen or

9    20 school districts and a dozen or 20 individuals can all be

10   set for the same day.  I would think that with that grouping

11   something will go to trial, and you'll have a protocol in place

12   if one settles which comes up next.  But given that there -- I

13   can only try one case at a time, and Judge Kuhl can only try

14   one case at a time, and then any appeals of any verdicts will

15   start their process up the normal chains.  Then at least we can

16   get a different cross-section of cases making their way up the

17   appellate ladders.

18        So I don't want to exclude the individual cases, but the

19   other two tracks of cases don't have another -- you know, they

20   don't have another forum.  I could always send them back to the

21   various states once we get them all ready and teed up, and we

22   could do that, too.  But that seems to me to be at least as a

23   first step, and then we can roll out the balance as we get

24   going.

25              **MS. HAZAM:**  Your Honor, if I may.  Just to clarify, I

1    understand the Court's instructions with regards to

2    prioritization.  Just to clarify, there are a substantial

3    number of school district plaintiffs in the JCCP, as well.  So

4    both the JCCP and the MDL have a mixture of personal injury and

5    school district plaintiffs.

6         **THE COURT:**  But she's not -- her focus has been thus

7    far the individuals.  You don't even have fact sheets for the

8    school districts.

9         **MS. HAZAM:**  Understood, Your Honor.  We are, we

10    believe, able to advance that very quickly.  That fact sheet,

11    it's, if anything, simpler and more straightforward than the

12    plaintiff fact sheet.  I believe we're in a posture of waiting

13    for feedback from the defendants on it, but we will try to

14    accelerate that meet and confer.

15         **THE COURT:**  Yeah, and I don't understand why we're

16    waiting -- why I'm being told that we're not even going to have

17    fact sheets on the state side until April.

18         **MS. HAZAM:**  I think that's a reference to the

19    individual fact sheets and the deadlines set in the order.  It

20    is plaintiffs' intent regardless of those deadlines to get as

21    many on file, or submitted I should say, as we can, as soon as

22    we can.

23        If I could ask Your Honor one question about the filing

24    for next Friday?

25         **THE COURT:**  Yes.

1          **MS. HAZAM:**  Is it your intent that the parties set

2    forth their proposals for how we would get to that trial date

3    in terms of a selection process of the cases?  I assume that is

4    the case, but I wanted to confirm.

5          **THE COURT:**  Look, I want you to do as much as you

6    can.  If you can't, then give me what you can.  I'm concerned

7    about numbers and having enough ready to go.

8          Let me say this about bellwethers.  It is a topic of

9    discussion, of frequency discussion at the MDL conference among

10   judges, and the bottom line is that nobody has a great answer

11   as to how to pick the ones that go to trial.  That is the

12   message, that there is no magic bullet.  There is no -- you

13   know, plaintiffs are always picking the ones that are best for

14   them, defendants are always picking the ones that are best for

15   them.  You don't necessarily get something that's truly

16   representative.  So you get the ends of the bellwether -- you

17   get the ends of the bell curve rather than the middle of the

18   bell curve.

19         So you can propose something.  I think that that's a topic

20   for discussion to figure out, you know, what will really go

21   first or who's ready to go first, but I don't think there's any

22   magic.  So my goal is to get things teed up to be tried, and I

23   don't care whose it is first.  I'm just going to have the

24   courtroom available to get things tried and trust jurors, which

25   is -- I trust jurors.

1          So can you do it in a week?

2               **MS. HAZAM:**  Yes, Your Honor.

3               **MR. LEWIS:**  Yes, Your Honor.

4               **MS. PIERSON:**  Yes, Your Honor.

5               **THE COURT:**  All right.  So that's due February 2nd.

6               **MS. HAZAM:**  Does Your Honor envision this as a joint

7     submission?

8               **THE COURT:**  Yes.  You don't have to -- if you don't

9     agree, that's fine.  Make sure I have a chart so I'm not having

10    to chart out your disagreement.

11              **MS. HAZAM:**  Understood, Your Honor.

12              **THE COURT:**  Okay.  I can meet with you February 6,

13    9:00 a.m., and we'll go through it, and I'll let Judge Kang

14    know.

15         Anything else you want to talk about on this front?

16              **MS. HAZAM:**  No, Your Honor.

17              **MS. PIERSON:**  Nothing for defendants, Your Honor.

18              **MR. LEWIS:**  Nothing for the states.

19              **THE COURT:**  All right.  Implementation orders.  I've

20    got -- this is the personal injury plaintiff fact sheet.

21    Again, for efficiency purposes I looked at it, and the work

22    that you all have done is satisfactory.  I don't need to nickel

23    and dime you on it.  So 550 and 551 are granted.

24         Now, with respect to the short-form complaint

25    implementation order, you seem to indicate that there was more

```
1   work that was going to be done in your statement.  So where do
2   we stand on those?  This is 520 and 524.
3            MS. PIERSON:  Your Honor, Andrea Pierson for the
4   defendants.  If I may, Mr. Warren?
5       We're very close on those two documents.  In fact, I think
6   we'll be in a position to submit those to Your Honor next week.
7   We had a little hiccup on the technical side with MDL
8   Centrality and working out an issue there that will affect what
9   happens in the JCCP and then the orders.  We, of course, want
10  those orders to be the same.  So I anticipate we'll get this
11  issue resolved very early next week.
12           MR. WARREN:  Your Honor, Previn Warren for the
13  plaintiffs.  We are in agreement with that.  This is just a
14  technical issue we're trying to solve together, and we should
15  be able to submit amended short-form complaint implementation
16  orders both for the personal injury cases and the school
17  district cases next week.
18           THE COURT:  Okay.  So you're withdrawing 520 and 524?
19           MR. WARREN:  Yes, Your Honor.
20           THE COURT:  Yes?
21           MS. PIERSON:  Yes, Your Honor.
22           THE COURT:  Okay.  Those are deemed withdrawn.  All
23  right.  We'll wait and look for your communication on the
24  others.
25           MR. WARREN:  Thank you, Your Honor.
```

1    **THE COURT:** Okay. As I promised, because I am not in

2    trial, we are scheduled to meet again on February 23rd at 2:30.

3    I can advance that to 9:30 so that those who are not local can

4    get flights home. So the 2:30 CMC is advanced to 9:30 a.m.

5        All right. What else do you want to talk about?

6        **MR. WARREN:** Your Honor, may I raise one issue

7    specific to one plaintiffs law firm, which is Motley Rice? We

8    did just want Your Honor's guidance on whether you'd like to

9    hear argument on the motions to dismiss concerning

10   Mr. Zuckerberg at either the next case management conference or

11   any other time, or not ever.

12       **THE COURT:** I'll let you know once I take a look at

13   the papers.

14       **MR. WARREN:** Okay. Thank you, Your Honor.

15       **MS. MIYATA:** Your Honor, Bianca Miyata for the state

16   plaintiffs.

17       I do have one administrative point regarding our response

18   to the motion to dismiss. Various sections of that motion call

19   for a response on state laws from 34 different states. I

20   believe early on in this litigation, the Court asked if we had

21   a chart compiling those various state laws as relevant to each

22   of the claims. We do have such a chart, and we would like to

23   ask the Court for permission to file that chart. To be very

24   clear, that would simply be an appendix with a recitation and

25   cite to those various laws without explanatory content. But we

1    would like to offer that if that would be of assistance or of

2    convenience to the Court.

3            **THE COURT:**  Any objection?  Any objection?

4            **UNIDENTIFIED SPEAKER:**  No, Your Honor.

5            **THE COURT:**  No objection.  The request is granted.

6            **MS. MIYATA:**  Thank you, Your Honor.  To be clear,

7    that would be in excess of our substantive responsive page

8    limits.

9            **THE COURT:**  I understand.

10           **MS. MIYATA:**  Thank you, Your Honor.

11           **MR. WARREN:**  Your Honor, the plaintiffs do not have

12   any other issues to raise at this time.

13           **THE COURT:**  Okay.  To the mic.

14           **MR. SCHMIDT:**  Nothing, Your Honor.

15           **THE COURT:**  Okay.  So if there's nothing else, then,

16   at this point I will wish everybody safe travels.  And the way

17   this is going to work in terms of my conversations, I will meet

18   individually with folks in chambers.  So the courtroom will

19   remain open, and my law clerks will come and get people as I

20   call them.  I had listed the individuals that I wanted to talk

21   to.

22       Is there anybody else who wants to chat?  Then just let my

23   CRD know so that I can put you on the list.  Okay?  Obviously

24   no need to talk with the defense attorneys or the AG's

25   attorneys.

1    Okay.  All right.  Thank you.  We're adjourned.

2         **THE COURTROOM DEPUTY:**  Court is adjourned in this

3    matter.

4         (Proceedings concluded at 11:15 a.m.)

5                        ---o0o---

6              <u>**CERTIFICATE OF REPORTER**</u>

7         I certify that the foregoing is a correct transcript

8    from the record of proceedings in the above-entitled matter.

9

10   DATE:  Friday, February 2, 2024

11

12

13   _____

14   Stephen W. Franklin, RMR, CRR, CPE
     Official Reporter, U.S. District Court

15

16

17

18

19

20

21

22

23

24

25